IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SHARI LYNN TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-4056-CV-C-NKL |
| ) | |
| STATE FARM MUTUAL AUTOMOBILE ) | |
| INSURANCE COMPANY ) | |
| ) | |
| Defendant. ) | |

ORDER

Pending before the Court is Defendant State Farm Automobile Insurance Company's ("State Farm") Motion For Summary Judgment [Doc. # 49]. For the reasons set forth below, the Motion is granted.

I.  Factual Background

   A.  Taylor's Early Tenure at State Farm

After receiving her bachelor's degree in commercial design and graphic arts, Plaintiff Shari Lynn Taylor ("Taylor"), who is African American, began working for State Farm in 1986 as a service technician. Her responsibilities included layout, design, publication, and calligraphy. In 1989 she was promoted to service technician II and gained responsibility for typesetting. Taylor became a service specialist in 1991, and her duties expanded to similar work on the computer. In 1993 she was promoted to public affairs assistant and assumed greater responsibility for the layout and design of State

1

Farm's employee newsletter, the *Pony Express*. Taylor became the senior editor of the *Pony Express* in 1996, controlling its content. She wrote many articles herself, some without bylines, as well as parts of articles attributed to other writers.

In 1997, Taylor became regional public affairs communications technician. Her responsibilities included graphic design, editing, writing, illustrating, calligraphy, photography, cartoons, branding, coordinating special projects, and creating promotional material for recruiting and marketing. She contributed to the production of several State Farm publications including *Focus, Pony Express, Vision,* and *Centerpoint.* Taylor became regional public affairs senior communications technician in 1998, and in 1999, her supervisor, Suzanne Rothwell ("Rothwell") recommended Taylor be promoted to regional public affairs graphics coordinator I. Her job was essentially the same but the volume of artwork expected of her increased.

In Taylor's April 2001 Quarterly Performance Review, Rothwell cited a few areas in need of improvement including multitasking, prioritizing projects, and meeting deadlines. In particular, Rothwell noted that Taylor "missed a very important deadline this quarter" to draw a caricature of an outgoing State Farm executive for his retirement party. Following this evaluation, Taylor was not promoted to graphics coordinator II or given a raise which she had expected. Taylor believed the poor evaluation was inaccurate and complained to State Farm human resources. She also filed a charge of racial discrimination with the EEOC in November 2001 against Rothwell, noting a four year history of perceived racial discrimination. It is unclear what action the EEOC took, if

any, to investigate the charge, but State Farm changed Taylor's April evaluation a month later. All "development needed" notations were changed to "proficient." In addition, Rothwell sent a memo to Taylor on December 6, 2001, apologizing because the caricature deadline was not clearly communicated to her and informing her that her evaluation had been corrected so that she was deemed proficient in all areas. Changing the evaluation and sending Taylor the letter upset Rothwell, who told a human resources employee that she resented the change and still thought her initial evaluation was accurate. Nevertheless, Rothwell sent another memo, also on December 6, to public affairs manager Ron Roberts recommending that Taylor be promoted to regional public affairs graphics coordinator II immediately. That memo also referenced the upcoming reorganization of several branches of State Farm's public affairs department into one Central Zone. Rothwell indicated that since Taylor was the only dedicated graphics artist in the to-be-formed Central Zone, "one can be sure that Shari's talents will be well utilized." Early the next year, Rothwell recommended that Taylor be given a wage increase. Taylor's position was reclassified as public affairs communications coordinator, requiring even more artwork of her.

### B. The Reorganization

As early as 2001, State Farm began to reorganize its public affairs division, collapsing three separate regional offices into one Central Zone for public affairs. The new Central Zone eliminated one of its publications and absorbed event planning and agency communication responsibilities. The 44 non-administrative employees who

worked in the public affairs department before the reorganization were placed in a pool for 33 positions that would remain after the reorganization. State Farm named Steve Simkins ("Simkins") as public affairs department manager for the new Central Zone and gave him the responsibility to oversee and implement the transition. In deciding which employees would fill the 33 reorganized positions, Simkins considered the following factors: (1) ability to perform multiple tasks relevant to the new structure; (b) past performance in one's current and past jobs; (c) length of service; (d) qualification of individual to perform revised duties under the new structure; and (e) need to ensure a diverse workforce. He met with assistant managers from the regional offices, including Rothwell, to discuss current employees and receive information and recommendations about who should fill which positions in the new organization.

Simkins also met one-on-one with all 44 employees to get to know them better and understand their job performance abilities. His meeting with Taylor was brief. He did not tell her about the above criteria or which positions he was considering her for. Nor did he tell her that she was in a pool competing for several positions; instead, she was told that she was competing against Linda Brewer, a white co-worker in the public affairs department, for the position of Communication Coordinator, and that both would be given tasks to determine who should have the job. Taylor was told that this new position would be more writing-intensive than her former position. Although Taylor preferred graphics work to writing and editing, and although her background and strengths were more suited to graphics, she was accustomed to doing frequent writing and editing work as well.

4

Brewer's background and strengths were more focused on writing. Given their different areas of expertise, it was explained to Taylor that Brewer would be given a graphic assignment and Taylor would be given a writing assignment and both would be judged in considering who got the new position. The article written by Taylor for the assignment was published with few edits in a State Farm publication. The graphic designed by Brewer was given to Taylor to be improved because it was too plain. Nevertheless, at the end of 2003, Simkins gave the new position of communications coordinator to Brewer instead of Taylor.

### C. After the Reorganization

Eight of the 44 employees in the original public affairs department were African-Americans. Of the 33 employees Simkins selected for positions in the newly reorganized Central Zone, only two were black. Although African-Americans made up less than 20 percent of the original department, more than half of the employees let go in the reorganization were black.

Taylor continued to perform her graphic design duties for several months after she was denied a position in the new Central Zone public affairs department. Originally, she was given a termination date in February 2004. But when Taylor complained to Simkins of the disparate impact his decisions had on black employees and advised him that she was filing another charge of discrimination with the EEOC, the termination date for unselected employees was extended until January 2005 to allow them time to seek other

5

positions within State Farm. Taylor also complained to the human resources department about the disparate impact.

Taylor twice applied for other positions in the Central Zone public affairs department in 2004. She was interviewed for both a marketing support assistant position and a public affairs assistant position. She was treated respectfully and properly during both application periods but did not get either job. The marketing position went to an applicant with significant marketing experience, and Taylor withdrew her application for the public affairs position before a decision was made. She continued to perform graphics duties until October 2004 when she applied for and accepted a position in the claims department, a job she still holds. She enjoys the position and finds it mentally stimulating. She is currently drawing a higher salary in the claims department than she drew in her previous position in public affairs, but her current position makes no use of her specialized education or experience in the graphic arts.

### D. EEOC Complaints

On February 2, 2004, after she did not receive the communications coordinator position, Taylor filed a charge of discrimination with the EEOC, alleging she had been denied the position on account of race. She amended the charge on February 27, adding a claim of retaliation for having filed an EEOC complaint in 2001. On May 18, 2004, she filed another charge of discrimination with the EEOC raising essentially the same complaints as the February charge. Taylor subsequently filed suit, alleging three counts against State Farm: racial discrimination in violation of Title VII and the Missouri Human

6

Rights Act ("MHRA"), racially motivated interference with a contract right in violation of 42 U.S.C. § 1981, and retaliation for asserting rights under Title VII and the MHRA.

## II. Discussion

Taylor's amended complaint alleges that State Farm took an adverse employment action against her on account of race (Count I), and in retaliation for complaining that State Farm had racially discriminated against her (Count III), and interfered with Taylor's contractual rights on account of race (Count II). As Taylor has presented no direct evidence of racial discrimination or retaliation, or contract interference, the Court employs the familiar burden shifting analysis first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973). *Pope v. ESA Servs.*, 406 F.3d 1001, 1006 (8th Cir. 2005) (Title VII and MHRA); *Johnson v. Legal Services of Arkansas, Inc.*, 813 F.2d 893, 896 (8th Cir. 1987) (applying *McDonnell Douglas* framework to section 1981 claims).

In the *McDonnell Douglas* analysis, the initial burden of production falls to the Plaintiff to make a *prima facie* showing of discrimination. *Pope,* 406 F.3d at 1006. The burden is minimal, *id.* at 1007, and depends on the underlying claim. As to Taylor's discrimination and contract interference claims, both parties agree that Taylor must produce some evidence that (1) she is a member of a protected class; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated differently. *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005). For her retaliation claim, she

7

must produce evidence that (1) she engaged in protected activity, (2) she suffered an adverse employment action; and (3) there is a causal connection between her protected conduct and the adverse employment action. *EEOC v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003). For both claims, a successful showing raises a presumption of discriminatory or retaliatory animus and shifts the burden of production to the Defendant to offer a legitimate, non-discriminatory basis for its adverse employment action. *Pope,* 406 F.3d at 1007. If the Defendant offers a non-discriminatory rationale, the presumption of discrimination disappears. *Id.* In order to survive summary judgment, the Plaintiff must then produce evidence that the proffered justification is merely a pretext for discrimination. *Id.* At all times, the burden of persuasion remains with the Plaintiff. *Id.*

### A. Discrimination and Contract Interference Claims

#### 1. Adverse Employment Action

Taylor's *prima facie* case for Courts I and II requires proof that she suffered an adverse employment action. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Cooney v. Union Pac. R.R. Co.*, 258 F.3d 731, 734 (8th Cir. 2001). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard." *Id.* "A transfer involving only minor changes in working conditions and no reduction in pay or benefits [does] not constitute an adverse employment action." *Zhuang v. Datacard Corp.*, 414 F.3d 849, 854 (8th Cir. 2005).

8

In *Zhuang*, the plaintiff was the only Chinese software developer in her office. Despite receiving good evaluations from her project managers and never missing a deadline, Zhuang was criticized by her supervisor, a man named Pothast, for having poor language skills and managing time poorly. He presented her with the options of accepting a lower position as a software tester, which she had previously held, or being placed on probation as a developer with no guarantee of continued employment. She opted for the tester position but retained her salary and her benefits at their previous level. When Pothast subsequently became the head of the testing division, he again gave Zhuang a poor evaluation. She filed a complaint with the EEOC, alleging that Pothast treated her differently than white employees by demoting her, and she eventually sued on that and other claims. On appeal from the district court's grant of summary judgment to Zhuang's employer, the Eighth Circuit held that Zhuang's transfer to a lesser position, even if involuntary, did not establish a *prima facie* showing of an adverse employment action because she received the same salary and had similar working conditions. *Zhuang,* 414 F.3d at 854-55. If anything, the Court noted, the transfer indicated an attempt by her employer to let Zhuang remain with the company. *Id.* at 855.

By contrast, in *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915 (8th Cir. 2000), the Eighth Circuit held that a plaintiff's transfer to a less prestigious sales job was *prima facie* evidence of an adverse employment action. In that case, Fisher worked in Pharmacia's animal health division prior to Pharmacia's merger with Upjohn. After the merger, the company reorganized the division into smaller, more specialized sales groups. Initially,

9

Fisher was placed in the prestigious corporate sales group. But after a year he was transferred to the pork sales division, ostensibly for poor performance in the corporate sales group, and was replaced by two younger men. The district court granted summary judgment to Pharmacia on Fisher's subsequent age discrimination suit, but the Eighth Circuit reversed. Concluding that he had made a *prima facie* showing of an adverse employment action, the appeals court noted,

> Fisher was transferred from the corporate sales unit, which Pharmacia itself touts as its premier sales unit, to an admittedly less prestigious unit, thereby effectively diminishing his title. In addition, the transfer significantly altered Fisher's working conditions, as Fisher, in Pharmacia's own words, was taken "out of the lead contact position with ... important client accounts in the corporate [sales unit]," and was placed in a position in which he sold to less lucrative clients and covered a smaller sales territory. Thus, we conclude that Fisher's transfer was an adverse employment action.

*Id.* at 919-920.

The present case bears greater similarity to *Zhuang* than *Fisher*. Taylor did not get a position in the reorganized Central Zone for public affairs, but she did find continued employment within State Farm. Her new position has no connection to her former duties or her education; however, her old position no longer exists in the reorganized public affairs department, and the position she had hoped to get would also have been a significant departure from her past duties and education in that it was more focused on writing than graphic arts. Taylor draws the same or greater salary now as she would have had if she were chosen as the communications coordinator, and she finds her current position enjoyable and mentally stimulating. The only adversity suffered was in the changed nature of her work and, by her own admission, she enjoys the work she is doing

10

now. She argues that her promotion options are limited because she is no longer in a field covered by her education, but that argument is belied by the fact that she got the claims department job despite having no specific training in that area. In sum, State Farm's reorganization left Taylor in a better position vis-à-vis her employer than either Zhuang or Fisher.

Taylor attempts to distinguish *Zhuang* on the grounds that Zhuang was transferred involuntarily whereas Taylor found continued employment with State Farm on her own after she was given a qualified termination date. She categorizes her attempt to find a new position as a mitigation of damages rather than a transfer. She argues that, had she done nothing, her eventual termination would have been *prima facie* evidence of an adverse employment action; therefore, it would be absurd to hold her own efforts to find an alternative position within the company against her.

It is undisputed that State Farm released a fourth of its public affairs personnel during its reorganization. It is also undisputed that the company gave Taylor an opportunity to find an alternative position. In fact, after Taylor complained to Simkins about the reorganization's perceived disparate impact on black employees, State Farm extended Taylor's termination date by almost a year to afford her even more opportunity to find another position. By granting her over ten additional months of employment in a position that no longer existed, State Farm attempted to provide Taylor a way of remaining with the company. *See Zhuang,* 414 F.3d at 854-55. The fact that she eventually found another position cannot be attributed solely to her own efforts as,

11

presumably, State Farm had at least as much say as Taylor in whether she could move to the claims department.

Taylor never stopped working for State Farm, her salary and benefits were never reduced, and she holds a new position in the company that she enjoys. The Court concludes that Taylor has not produced sufficient evidence from which a reasonable juror could find that she suffered any adverse employment action with regard to her discrimination claims. Since she has not satisfied her *prima facie* burden, the Court need not consider the other two steps of the *McDonnell Douglas* burden shifting analysis.

### 2. Failure to Promote

Although both parties argue the merits of Taylor's discrimination claims under the four elements enumerated in *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005), their briefing occasionally treats the case as one for failure to promote. The only proof of an adverse employment action required of a plaintiff under a failure to promote theory is proof that she did not receive the promotion. In a failure to promote case, a plaintiff must prove that (1) she is a member of a protected group; (2) she was qualified and applied for the promotion; and (3) a similarly situated employee, not part of the protected group, was promoted instead. *Younts v. Fremont County*, 370 F.3d 748, 754 (8th Cir. 2004).

Even assuming that Taylor could satisfy her prima facie burden under the failure to promote rubric, State Farm has met its shifted burden to show a legitimate, nondiscriminatory basis for denying Taylor the new position. The Communications Coordinator position did involve some graphic arts, but it was primarily a writing

12

position. Simkins determined that Linda Brewer was a better writer than Taylor and thus more qualified for the position. The superior qualification of another employee is a legitimate, non-discriminatory basis for denying Taylor the position. *See Turner v. Honeywell Fed. Mfg. & Techs., L.L.C.*, 336 F.3d 716, 723 (8th Cir. 2003). The presumption of discrimination is therefore rebutted, and the burden of production shifts back to Taylor to show that the proffered reason was mere pretext for a discriminatory motive. *Id.*

State Farm believed Brewer was a better writer than Taylor, and the evidence clearly shows that Brewer had been more focused on writing than had Taylor. After denying Taylor a position dominated by writing responsibilities, State Farm gave her almost a full year to find another job within the company, allowing her to remain in the Public Affairs department until she did so. She was well treated during the transitional period and found a new position in the Claims Department which she enjoys. In view of the efforts State Farm made to allow Taylor to remain with the company and the fact that Brewer had more experience as a writer, the Court concludes that no reasonable juror could find the decision to hire Brewer over Taylor was pretext for racial discrimination.

State Farm is entitled to summary judgment on Counts I and II regardless of whether Taylor's claim is based on her failure to get the communications coordinator job or her failure to get any job in the reorganized Central Zone for Public Affairs.

B.   **Retaliation Claim**

Taylor's retaliation claim must be analyzed separately from her discrimination claims in the wake of the Supreme Court's recent decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U. S. \_\_\_\_ (2006). The plaintiff in that case, a female forklift operator, complained to her employer that her immediate supervisor had made discriminatory comments to her about her gender in front of male coworkers. The company investigated her complaint and eventually suspended the supervisor. However, shortly thereafter the plaintiff was transferred from her forklift job to standard track laborer tasks due to complaints that "'a more senior man' should have the 'less arduous and cleaner job' of forklift operator." *Id.,* slip op. at 3. She sued under Title VII. Affirming a jury verdict in her favor, the Supreme Court held that, in order to prove an adverse employment action in the context of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 13. The Supreme Court crafted this new standard in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 14.

Given this new standard, the Court concludes that Taylor has satisfied her *prima facie* burden to show an adverse employment action in Count III. Although moving to an enjoyable, equal- or better-paying job in the claims department is not a sufficiently adverse employment action to state a claim for racial discrimination, it is, in the circumstances of this case, sufficient to state a claim for Title VII retaliation. If

14

complaining about perceived racial discrimination precipitates a transfer to a different division within a company where all of one's education and experience are no longer necessary or useful, the Court concludes that a reasonable employee would be dissuaded from making the complaint. Taylor has met her burden as to this element.

There is no dispute that Taylor engaged in protected activity by filing her EEOC charge of discrimination, so her *prima facie* case turns on whether she has offered some evidence of a causal connection between the protected activity and her transfer to a new position. The Court concludes that she has not. Taylor filed her EEOC complaint in November 2001 against Rothwell. The decision not to retain her within the reorganized Central Zone for Public Affairs was made two years later by its new director, Steve Simkins. The Eighth Circuit has held the passage of one year between an EEOC complaint and an adverse employment action "weakens the showing of the required causal link." *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 859 (8th Cir. 2005). Indeed, the Eighth Circuit has held that "the time interval of more than two months is too long to support an inference of causation." *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir. 2003).

Taylor concedes that Simkins's decision was not directly influenced by her EEOC complaint two years earlier. Instead, she argues that Rothwell deliberately poisoned Simkins's impression of her through negative evaluations, and deliberately withheld from Simkins information about the writing/graphics competition between Brewer and Taylor. In not so many words, she argues that Simkins was a "cat's paw" for Rothwell, "one used

15

by another to accomplish [her] purposes." *Kramer v. Logan County Sch. Dist. No. R-1*, 157 F.3d 620, 627 (8th Cir. 1998). As the Eighth Circuit has explained in other cat's paw cases,

> an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design.

*Dedmon v. Staley*, 315 F.3d 948, 949 (8th Cir. 2003). Thus, Taylor could still make out a case for retaliation if she could show that Simkins's decision to hire Brewer instead of Taylor was really the result of Rothwell's animus.

There is no evidence other than Taylor's own testimony that Rothwell withheld information from Simkins regarding the writing/graphics competition between Taylor and Brewer. The minutes of the meeting between Rothwell and Simkins do indicate Rothwell's characterization of Taylor as a "good designer, better than Linda [Brewer]" and "not a good writer, worse than Linda." Plf. Ex 7. The minutes also state that Taylor's "writing has been unsuccessful," that her "brief stint as editor of 'The Pony' . . . was unsuccessful," and that she had a "history of performance issues." *Id.* Thus, there is some evidence that Rothwell conveyed a negative impression of Taylor to Simkins in the meeting. However, Simkins testified in deposition that he considered Rothwell's evaluation of Taylor as only "one piece" of information relevant to his decision. He also considered the relative writing experience of the two candidates. Taylor admitted in deposition that Brewer wrote 50 percent of the articles in the publications she oversaw, approximately ten times more writing that Taylor did. Taylor also concedes that the

16

communications coordinator position was much more focused on writing than graphics work, and that Taylor preferred graphics. Even if Rothwell did convey an unjustified, negative impression of Taylor to Simkins, there is no evidence that her recommendations were so compelling that Simkins was merely the conduit for Rothwell's animus. In view of Brewer's greater experience as a writer and editor, no reasonable juror could find that Simkins was merely a cat's paw for Rothwell, let alone that Rothwell's actions were motivated by an EEOC complaint filed more than two years earlier. This conclusion is further supported by the fact that Simkins allowed Taylor to remain in the Central Zone for nearly a year after his decision while she sought another position within State Farm.

As Taylor has failed to satisfy her *prima facie* burden, summary judgment is appropriate in State Farm's favor on Count III as well.

### III. Conclusion

Accordingly, it is hereby

ORDERED that Defendant State Farm's Motion for Summary Judgment [Doc. # 49] is GRANTED.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 8, 2006  
Jefferson City, Missouri